Donkin, Ch.,
delivered the opinion of the Court.
The testator, contemplating the necessity of a sale, in order to make a division of the slaves among the numerous legatees mentioned in the sixth and seventh clauses of his will, directs his executors to have them appraised and sold in a particular manner, and “ to account with the respective legatees for the sales of the negroes.”(A) The mode of sale prescribed by *136 the testator being found impracticable, and the necessity of a sale manifest, the executors sold the slaves at public outcry, and both signed the sale-bill, which was returned by them to the ordinary. No objection is made to the fairness of the sale, or to the terms, or to the adequacy of the prices at which the property was sold, nor is it sought to rescind the sale. But the purchasers gave notes for the credit portion of the sale, and James Robertson, one of the executors, took the larger portion of them and kept the whole, for about five months, in his possession, when about one-half of them were delivered to the defendant, his co-executor. It is insisted that the defendant is liable for the sums received by his co-executor, James Robertson first, because the sale was not directed by the will, nor authorized by any decree of the Court of Ordinary, or Court of Equity. It must be borne in mind, that this is not a proceeding to invalidate that sale; and, in reference to any peculiar liability of the defendant, on that account, it is proper to remark, that what this Court would have authorized, if the application had been made, it *137 will now sanction when done. The necessity of the sale was felt by the testator. His regard to his slaves induced him to prescribe the particular mode of accomplishing his purpose. When this was found impracticable, the executors thought they might adopt the usual mode of making the sale. Strictly, this was not authorized by the will, although the executors might very well have misapprehended their power, and especially as no objection was made from any quarter. But again, it is said, that assuming the sale to have been both necessary and' proper, both executors are liable, each for the acts of the other, because both concurred in the sale. In other words, that, as the sale was made by the authority of both, the defendant is. responsible for any sums received by his co-executor, James Robertson, deceased. “ Nothing is clearer, and I never knew it questioned,” says Sir John Strange, in Jacomb vs. Harwood, (2 Ves. Sen. 267,) “ that one executor may release or pay a debt,” <fcc. The notes must, from necessity, have been taken by one of the executors, or they might have been divided. But the possession of the notes was unimportant. Each had a right to receive the proceeds ■ of sales. Without fraud, a purchaser might pay to either of the executors, whether he held his note or not, and his receipt would be a good discharge; and so it was expressly ruled by the Court of Law in Gage vs. Adm'r. of Johnson, (1 McC. 492.) If an executor, haying received funds of the estate, pays or delivers them over to his co-executor, or joins in a misapplication of them, or joins in a receipt which enabled his co-executor to receive them, he may be made responsible. But the general rule of the Court, as declared in O'Neall vs. Herbert, (McM. Eq. 497,) is, that one executor is not liable for the assets which come into the hands of his co-executor; and the same rule was applied to joint administrators in Gayden vs. Gayden, (Id. 435). Where, as in this case, the sale is on credit, no means can well be devised by which one executor could prevent his co-executor from collecting the debts, even if he were so disposed, or had the right to do so. The case of Mathews vs. Mathews, (McM. Eq. 410,) was cited for the appellant. That *138 ■was an application, to the Court of Equity, for the sale of land, in which both the executor and executrix joined. The purpose was to change the investment. The Court ordered the sale, and directed that the proceeds should he re-invested by the executor and executrix, and the investment reported to the Court. The executor received the proceeds — no re-investment was made, and, five years afterwards, he died insolvent. Chancellor Harper, with much reluctance, held the executrix responsible. “ It is to be observed” says he, “ that, as executors, they had nothing to do with the land; there does not appear to have been any necessity to sell for the purpose of debts; and, in procuring a sale of the land, they seem to have volunteered to act as trustees.” Again; “being a party to the suit, Mrs. Mathews was bound by the decree. The decree is, that the executor and executrix shall invest and report to the Court, making it the duty of both to see to the investment. By consulting the records' of the'Court, she might, at any time, have seen that the executor had not reported any investment. If she had applied to the Court, at any time within five years, the investment by him would have been enforced.” The decree was affirmed by the Court of Appeals. But the avowed reluctance of the Chancellor, as well as the reasons set forth, abundantly prove that, as a general rule, each executor is only responsible for his own acts or defaults.
This Court concurs in the judgment of the Chancellor, and the appeal is dismissed.
Johnston and Dargan, CC. concurred.
WaRdlaw, Ch. having been of counsel, did not sit at the hearing.

Appeal dismissed.

 A ) Toa proper understanding of this ease, the following clauses of the will of William Robertson, seem to be necessary:
“ 6th. In compliance with a promise made to my last wife, I will and bequeath unto Christiana Hatcher, JosephParker, Benjamin Parker, William Parker, Hezekiah Barnes and Tracy Barnes, now the wife of one Tally, the following negroes, viz: Old Andrew, Maty, Harriet, Chester, Jesse, Chai'lesey, John, Gluiney, Jim, Phil, George, Peggy, Young Mary, Odin, to be equally divided between them and their heirs forever.
“ 7th. I will and bequeath the following negroes, viz: — Old Phil, Pompey, Young Andrew, Peter, Candis, Caroline, Creasy, Elbert, Andrew, a boy about three years old, Wi.liam and Kitty, to be divided as follows: — One share to my sister, Elizabeth Horn, if she be living, if not, to her children— one share to the children of my deceased brothr, Henry Robeertson — one share to the children of my deceased brother, Peter Robertson — one share to my sister, Temperance Robertson, if alive, if not, to her children — one share to the children of my deceased brother, John Robertson — one share to my brother Higdon Robertson, and one share to the children ofmy deceased brother, Nathaniel Robertson. If either of my brothers or sisters die before my death, leaving children, their children, respectively, are to take the *136 share of their parents; and in case the children of either of my brothers or sisters should die before my death, then the share hereby given to such children, shall be divided equally among my surviving brothers and sisters, and the children of such of my brothers and sisters tvho may have died, the said children taking the part, respectively, to which their parents would have been entitled if living.
“9th I devise and bequeath all the remainder ofmy real estate, and all the residue of my personal estate of every kind and description, to the persons and in the manner mentioned in the seventh clause of this my will.
“ 10th. As it may be impracticable to divide the negroes mentioned in the sixth and seventh clauses of my will, among the legatees therein named, and as I desire to consult the future comfort of my negroes, I hereby direct and require my executors, after my death, to select three disinterested persons to appraise my said negroes, and my executors are hereby authorized and required to allow my said negroes to select their owners, who may be permitted to take them on a credit of twelve months, at the said appraisement, giving to my executors their bonds and approved securities for the money. In the said appraisement and sale herein directed, my executors are required to keep distinct, the negroes mentioned in the sixth clause, from the ne-groes mentioned in the seventh clause of this will, and account with the respective legatees mentioned in those clauses for the sales of the negroes therein mentioned.”
The following is the reason, assigned by Douglas Robertson in his answer, why die executors sold the slaves in a mode different from that prescribed by the testator:
“ As to the sale of the negroes mentioned in the sixth and seventh clauses of the will, this defendant answers, that nearly all of the said negroes, were either unwilling or unable to select persons who would take them, under the provisions of the will, at the appraisement, and as the legatees were very numerous and much scattered, a large portion of whom reside out of the State, and as, under the circumstances, the estate could not well have been kept together, nor actually divided, it was deemed best for all concerned, that the said negroes should be sold.”